**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| JOHN W. GRIFFITHS, III, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 15-2586 (ES) (MAH) |
| | : | |
| v. | : | OPINION |
| | : | |
| KIRSTJEN NIELSEN,[1] Secretary, | : | |
| U.S. Dept. of Homeland Security, | : | |
| | : | |
| Defendant. | : | |

SALAS, DISTRICT JUDGE

## I.     Introduction

The Age Discrimination in Employment Act of 1967 (the "ADEA") and Title VII of the Civil Rights Act of 1964 ("Title VII") prohibit discrimination in the workplace, including in the federal sector.  But not all seemingly unfavorable workplace conduct—even if distressing for a claimant—arises to discrimination under the law.  Indeed, there have been several instances when courts find, at the summary judgment stage, that the complained-of conduct does not warrant the need for a trial.  This is one such matter.

Plaintiff John W. Griffiths, III ("Griffiths" or "Plaintiff"), a federal employee, claims he was improperly subjected to disparate treatment, a hostile work environment, and retaliation under the above statutes.  Defendant Secretary of the U.S. Department of Homeland Security (the "Secretary" or "Defendant") moves for summary judgment, arguing that there is no genuine

---

[1]      Since the parties briefed the motion at issue in this Opinion, Kirstjen Nielsen succeeded John Francis Kelly as Secretary of the U.S. Department of Homeland Security.  Under Federal Rule of Civil Procedure 25(d), a public officer's successor is automatically substituted as a party in an action brought against the public officer in an official capacity.  The accompanying Order reflects this automatic substitution.

fact dispute on any of his claims. The Court agrees with the Secretary and finds that summary judgment is appropriate.[2]

## II.    Relevant Background[3]

### A. Griffiths's Personal & Professional Background

Griffiths is a white male. (D.E. No. 42-2, the Secretary's Statement of Material Facts ("Secretary's SMF") ¶ 1). He was 56 years old during the alleged incidents underlying this action (the "relevant time period"). (*Id.* ¶ 2).

From around September 2002 through June 2006, the U.S. Customs and Border Protection ("CBP") employed Griffiths. (*Id.* ¶ 3). His position was a "GS-14" for purposes of salaries and wages during this period. (*Id.*). Griffiths worked at CBP headquarters in Washington, DC. (*Id.* ¶ 5).

Then, in June 2006, Griffiths accepted a voluntary downgrade from a GS-14 position to a GS-13 position when he transferred to the Newark field office of the "Customs Trade Partnership Against Terrorism" ("C-TPAT") program. (*Id.* ¶ 4). Briefly, the C-TPAT program is a public-private sector partnership. (*Id.* ¶ 11). C-TPAP partners work with CBP to protect their supply chains from being infiltrated with all types of contraband in exchange for CBP providing these

[2]    The Court has jurisdiction under 28 U.S.C. § 1331 and resolves the Secretary's motion without oral argument under Federal Rule of Civil Procedure 78(b).

[3]    These background facts are undisputed unless otherwise noted. For example, citation to "Secretary's SMF ¶ 1" means that Griffiths has not contested this statement of fact. (*See* D.E. No. 45, Griffiths's Response to the Secretary's Statement of Material Facts ("Griffiths RSMF") ¶ 1)). Similarly, any citation to Griffiths's supplemental statement of facts (furnished in opposition to the Secretary's summary-judgment motion) means that the Secretary has not contested the given statement of fact. (*See, e.g.*, D.E. No. 45, Griffiths's Supplemental Statement of Material Facts ("Griffiths Supp. SMF") ¶ 126; D.E. No. 50, the Secretary's Response to Griffiths's Supplemental Statement of Materials Facts ("Secretary's RSMF") ¶ 126)). The Court also notes that additional facts are provided elsewhere in this Opinion as relevant to the Court's analysis.

Finally, the Court assumes some familiarity by the parties of the background and procedural history of this case. For example, the interested reader is presumably less concerned with the Court discussing the typographical numbering error in Griffiths's Response to the Secretary's Statement of Material Facts that regrettably led to a misalignment of his responses. (*See* Secretary's RSMF at 2 n.1).

partners reduced inspection at arrival ports and expedited processing at the border, among other things.  (*Id.* ¶ 12).   Before becoming a C-TPAT partner, an applicant is assigned a C-TPAT "Supply Chain Specialist" to review the applicant's materials and provide guidance on an ongoing basis.  (*Id.* ¶ 13).

At the Newark field office, Griffiths started working as a "Supply Chain Security Specialist."  (*Id.* ¶ 4).   The Newark C-TPAT office employed him during the relevant time period.  (*Id.* ¶ 7).   And to be sure, the CBP position Griffiths held in Washington, DC, was *not* part of the C-TPAT program.  (*Id.* ¶ 6).

During the relevant time period, the Newark C-TPAT office had a "Field Office Director" position, a "Supervisory Supply Chain Security Specialist" position, and several "Supply Chain Security Specialist" positions.  (*See id.* ¶ 15; Griffiths RSMF ¶ 15).   As evident below, the latter two positions—"Supervisory Supply Chain Security Specialist" and "Supply Chain Security Specialist"—are particularly relevant.

### B.  Griffiths's Supervisors

When Griffiths transferred to the Newark C-TPAT office in June 2006, Edwin Hotchkiss—a white male about 2 years *older* than Griffiths—was the Field Office Director.  (*See* Secretary's SMF ¶¶ 1, 4, 16, 17).   Indeed, from June 2006 until December 2012, Hotchkiss was the Field Office Director at this office.  (*Id.* ¶ 16).   It appears undisputed that, from January 2012 until August 2013, Anthony Orosz—a white male who was about 15 years *younger* than Griffiths—held the Supervisory Supply Chain Specialist position.  (*Id.* ¶¶ 18-19).   But Orosz was detailed to another CBP office during this period.  (*Id.* ¶ 18).   So Tara Fionda—a white female about 19 years *younger* than Griffiths—was the Acting Supervisory Supply Chain Specialist for

almost one year during Orosz's detail. (*See id.* ¶¶ 1, 19, 20, 21). To reiterate, Griffiths was a Supply Chain Security Specialist. (*See id.* ¶ 4).

### C. An Acting Field Office Director Arrives in Newark

In December 2012, Hotchkiss prepared to retire and, during that month, there was overlap between himself and the incoming Acting Field Office Director, Harvey Vazquez. (*See id.* ¶ 28). Before this, Vazquez—a Hispanic male about 6 years *younger* than Griffiths—worked in various government positions. (*See id.* ¶ 30). In particular, Vazquez started working in the Newark C-TPAT office in December 2006 as a Supply Chain Security Specialist. (*Id.* ¶ 31). From then until about June 2012, Vazquez worked in this office with Griffiths. (*See id.* ¶¶ 32, 33).

But, in or around June 2012, Vazquez left the Newark C-TPAT office for a promotion in Washington, DC, and worked in CBP. (*Id.* ¶ 34). Then, in December 2012, Vazquez was asked to return to the Newark C-TPAT office and serve as the Acting Director. (*Id.* ¶ 35). As noted above, Orosz—the Supervisory Supply Chain Specialist—was on detail to another office during this period, and Fionda was serving as the Acting Supervisory Supply Chain Specialist. (*See* D.E. No. 42-4 ¶ 11). This was the situation when Vazquez started as Acting Director. (*See id.*).

Being a Field Office Director put Vazquez in a supervisory role over Griffiths. (Secretary's SMF ¶¶ 39, 40). To be sure, however, the first-line supervisor for Griffiths is the Supervisory Supply Chain Security Specialist, and the second-line supervisor is the Field Office Director. (*Id.* ¶¶ 41, 42).

### D. Griffiths Wants to be a Temporary Supervisory Supply Chain Security Specialist

In December 2012, Vazquez sent certain correspondence to various individuals—inside and outside the Newark office—about the position of Supervisory Supply Chain Security Specialist. (*See id.* ¶¶ 44-48). In particular, on December 5, 2012, he emailed the entire staff of

Supply Chain Security Specialists in the Newark C-TPAT office. (*Id.* ¶ 48). That email reflected the first time the staff was presented an opportunity to serve as an Acting Supervisor Supply Chain Security Specialist *on a rotating basis* in the Newark C-TPAT office. (*Id.* ¶ 50).

In that email, Vazquez stated that he wanted to "extend an opportunity to perform in the role of temporary supervisor on a rotating basis for 60 days," noting that "volunteering will simply serve as an opportunity to enhance your skill base by understanding the roles and responsibilities of serving in a supervisory capacity." (*Id.* ¶ 49). The parties agree that the rotating, temporary Supervisory Supply Chain Security Specialist had more responsibilities than a Supply Chain Security Specialist. (*See* Griffiths Supp. SMF ¶ 135). During a later meeting, the staff was informed that everyone could apply for this temporary position. (*See* Secretary's SMF ¶ 52; Griffiths RSMF ¶ 52). So, "[b]eginning in December 2012, Supply Chain Security Specialists in the Newark C-TPAT Office were selected to serve as Acting Supervisory Supply Chain Security Specialists on a 60-day basis." (*See* Secretary's SMF ¶ 60).

Vazquez testified in his deposition as follows: "I want[ed] to give the opportunity to those who have not had a chance to act in a supervisory capacity. Those who have served in a supervisory capacity can certainly put in the paperwork. However, I would give preference to those who have not had that opportunity." (D.E. No. 42-5, Ex. D at 18:6-12 (discussing what was said at a December 10, 2012 staff meeting)). The Court notes here that, at some point while employed in the Newark C-TPAT office, Griffiths served a detail in the Washington, DC, C-TPAT office as an Acting Supervisory Supply Chain Security Specialist Position for a period of 45 days. (Secretary's SMF ¶ 53). Vazquez testified in his deposition that he identified two other employees—in addition to Griffiths—who had some supervisory experience. (*See* D.E. No. 45-2 at 103:24-104-25 (identifying Bryan Smith and Ted Rucki)).

In February 2013, Griffiths emailed Vazquez, expressing his desire to volunteer as an Acting Supervisory Supply Chain Security Specialist when the previous individual's term concluded. (Secretary's SMF ¶ 62; *see also* Griffiths Supp. SMF ¶ 133 ("Vazquez admitted and it is undisputed that Plaintiff expressed interest in the rotating supervisory position."); D.E. No. 42-4, Ex. E (email from Griffiths to Vazquez: "Dear Harvey: I would like to volunteer to serve as an acting supervisor when Christine Azzolini's tenure concludes.")). Vazquez responded to Griffiths, telling him: "I've already asked for names earlier when I first arrived. I also mentioned that yourself and [another individual] had the opportunity to be an acting supervisor in Washington DC. It's only fair to others who are just as qualified get the same opportunity." (Secretary's SMF ¶ 63; D.E. No. 42-4, Ex. E). Vazquez told Griffiths in a subsequent email: "I know the quality of work you put in day in and day out makes you a great candidate for Supervisor whether that be here in Newark or elsewhere." (D.E. No. 42-4, Ex. E).

Four individuals served as 60-day Acting Supervisors until the Supervisory Supply Chain Security Specialist position was permanently filled—and none of these individuals got a pay raise, advancement in salary grade, or additional benefits when they were acting in their 60-day terms. (Secretary's SMF ¶¶ 65-70). To be sure, however, Griffiths avers that it "is a legal conclusion as to whether the [Acting Supervisory Supply Chain Security Specialist] position constituted a 'promotion.'" (*Id.* ¶ 70).

Finally, in August 2013, Christine Azzolini (who had served a 60-day term as an Acting Supervisory Supply Chain Security Specialist) was selected as the permanent Supervisory Supply Chain Specialist in the Newark C-TPAT office. (*See id.* ¶¶ 61, 65, 71). Azzolini—a white female nearly 17 years *younger* than Griffiths—was, in fact, the first person selected to serve as a 60-day Acting Supervisory Supply Chain Security Specialist. (*See id.* ¶¶ 1, 61, 66).

"The only information available to Vazquez that he looked at prior to offering her the role was her performance reviews and past assignments." (Griffiths Supp. SMF ¶ 141). As for her background, she had transferred from John F. Kennedy Airport (where she started as a Supply Chain Security Specialist) to the Newark C-TPAT office for commuting reasons in 2006. (*See* Secretary's SMF ¶ 72). "Vazquez was aware that Azzolini previously served as a team leader" at Kennedy Airport. (Griffiths Supp. SMF ¶ 142).

### E. Griffiths Seeks Administrative Remedies & Files This Action

Briefly, a federal employee has two options for pursuing an ADEA discrimination claim: (1) forgo any administrative action and sue in federal court after giving the Equal Opportunity Employment Commission (the "EEOC") thirty days' notice of intent to sue; or (2) file a complaint with the EEOC and sue in federal court if dissatisfied with the EEOC's disposition. *Slingland v. Donahoe*, 542 F. App'x 189, 193 (3d Cir. 2013) (citing 29 U.S.C. § 633a(b), (c), (d)). As for bringing a Title VII claim, a federal employee must exhaust administrative remedies, which begins with contacting an EEOC Counselor and then taking certain actions in certain time frames. *See, e.g.*, *Carter v. Potter*, 258 F. App'x 475, 477-78 (3d Cir. 2007); *Green v. Potter*, 687 F. Supp. 2d 502, 513-14 (D.N.J. 2009).

Here, Griffiths pursued administrative remedies for his ADEA and Title VII claims. (*See* Secretary's SMF ¶ 118). His "initial EEO counsel contact pertaining to the claims in this action was on April 4, 2013." (*Id.*). His "Complaint of Employment Discrimination . . . was filed on July 1, 2013." (*Id.* ¶ 119). In a letter dated October 29, 2013, the "CBP Office of Diversity and Civil Rights" notified Griffiths "that his complaint was accepted for processing." (*Id.* ¶ 120). The agency accepted the following claim: "Whether Customs and Border Protection discriminated against Complainant, Supply Chain Security Specialist . . . assigned to the

Customs Trade Partnership (C-TPAT), Newark Port of Entry, Newark, NJ, . . . based on his race (White), sex (male), age (56), and retaliation (prior and current EEO activity) when he was allegedly subjected to harassment from December 2012 to the present." (*Id.* ¶ 121; *see also id.* ¶ 122 (identifying the issues to be resolved for the administrative process)). After CBP issued an order implementing an administrative judge's decision of "no discrimination," Griffiths brought this action. (*See id.* ¶¶ 123-126).

He asserts two causes of action against the Secretary. First, he brings a claim for discrimination under Title VII, alleging that the Secretary's conduct "constitutes unlawful discrimination . . . based on gender and race" and "constitutes retaliation." (*See* Compl. ¶¶ 28-31). Second, Griffiths brings a claim under the ADEA, alleging that the Secretary's conduct "constitutes unlawful age discrimination" and "constitutes retaliation." (*Id.* ¶¶ 32-36).

### F. Griffiths's Particular Allegations in this Action

Griffiths brought this action, alleging (among other things) that: "In or about February 2013, the supervisor responded inappropriately to Plaintiff's question relating to work assignments." (Compl. ¶ 23). Griffiths also alleges that: "On or about February 18, 2013 through April 15, 2013, management postponed Plaintiff's work-related trips to Canada." (*Id.* ¶ 24). During the pre-suit administrative process, Griffiths stated that: "Vazquez kept changing his mind. Validations were on, then off, then on again." (*See* Secretary's SMF ¶ 83). Griffiths's work-related trip to Canada took place from April 15 to April 19, 2013. (*Id.* ¶ 84).

Griffiths also alleges that: "On or about March 23, 2013, the supervisor questioning [sic] Plaintiff about his whereabouts and attempted to bribe him by offering him a supervisory position in headquarters." (Compl. ¶ 25). As for this allegation, Griffiths testified that Vazquez told him: "if I transferred to HQ, I would not have to go through the normal hiring processes and

that I would be promoted to GS-14 again in a very short period of time." (Secretary's SMF ¶ 91). Griffiths reported his concerns to the CBP Office of Internal Affairs and, the allegation that Vazquez tried to bribe Griffiths, was investigated and determined to be unfounded. (*Id.* ¶¶ 92-93). Although Griffiths agrees that his concerns were so reported, he does not unequivocally agree to the latter; he responds only that a declaration affirms that the bribery allegation was investigated and determined to be unfounded. (*See* Griffiths RSMF ¶¶ 92-93).

Another allegation is that: "On or about April 4, 2013, [Griffiths] received a 'Memorandum of Instruction.'" (Compl. ¶ 26). Griffiths agrees that this memorandum pertained to alleged unprofessional behavior on his part. (*See* Secretary's SMF ¶ 98; Griffiths RSMF ¶ 98).

Finally, Griffiths alleges that: "On or about May 9, 2013, Plaintiff learned that he was the subject of an administrative investigation conducted by the Office of Internal Affairs." (Compl. ¶ 27). During an administrative investigation, the CBP Office of Internal Affairs questioned Griffiths about whether he brought a gun to work in September 2012, as well as whether he "sometimes screamed, yelled, or said inappropriate and unprofessional derogatory things about supervisors or co-workers in the office environment." (Secretary's SMF ¶¶ 109, 110).

The parties agree that Griffiths has testified: he is upset that he has not been promoted; he has publicly made fun of Vazquez because of Vazquez's stuttering disability; and, after the Office of Internal Affairs investigation, Vazquez had the authority to decide whether any employment action would be taken against Griffiths—but no disciplinary action has been taken against Griffiths. (*Id.* ¶¶ 111-115).

The Secretary moves for summary judgment, seeking dismissal of this entire action.

## III.     Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" issue of material fact exists for trial "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the non-moving party bears the burden of proof at trial, the moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the movant meets this burden, the non-movant must then set forth specific facts that show the existence of a genuine issue for trial. *Id.* at 324; *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).

"To survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex*, 477 U.S. at 325); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that, when the moving party has carried its burden under Rule 56, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). And the "mere existence of a scintilla

of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

Finally, "a district court must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." *Podobnik*, 409 F.3d at 589 (citations omitted).

## IV.  Discussion[4]

### A.  Griffiths's disparate-treatment claim must be dismissed.

#### 1.  The Law

As an initial matter, the ADEA prohibits age-related discrimination in federal government employment for individuals over 40.  *See Ullrich v. U.S. Sec'y of Veterans Affairs*, 457 F. App'x 132, 137-38 (3d Cir. 2012) (citing 29 U.S.C. § 633a).  More to the point, ADEA claims may proceed under a "disparate-treatment theory."  *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 69 (3d Cir. 2017).  Such claims are governed by 29 U.S.C. § 623(a)(1).  *Id.*

Under that statute, the "ADEA prohibits employers from 'discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'"  *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643-44 (3d Cir. 2015) (quoting 29 U.S.C. § 623(a)(1)) (alterations in original).  In short, disparate-treatment claims under the ADEA concern age discrimination.  *See Karlo*, 849 F.3d at 72.

---

[4]      As noted above, starting in December 2012, "Supply Chain Security Specialists in the Newark C-TPAT office were selected to serve as Acting Supervisory Supply Chain Security Specialists on a 60-day basis."  (*See* Secretary's SMF ¶ 60).  Although it would be convenient to use a certain designation or name for this Acting position, the parties (understandably) refer to it in various ways such as: "temporary supervisor position" (D.E. No. 46 ("Pl. Opp. Br.") at 5, 6); "acting supervisor role" (*id.* at 10); "temporary position" (*id.*); "temporary supervisor role" (*id.* at 11); "acting supervisor" (D.E. No. 49 ("Def. Reply Br.") at 1, 2, 5); "acting supervisor position" (*id.* at 10).  So too will the Court.

As here, "[a]ge discrimination claims in which the plaintiff relies on circumstantial evidence proceed according to the three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*." *Willis*, 808 F.3d at 644 (citing 411 U.S. 792 (1973); *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)).[5] "Under this framework, the plaintiff must first establish a *prima facie* case of discrimination." *Willis*, 808 F.3d at 644 (citation omitted).

A plaintiff alleging employment discrimination under the ADEA must make a prima facie case with four elements: (1) he is over 40 years old; (2) he is qualified for the position; (3) he suffered from an adverse employment decision; and (4) his replacement was sufficiently younger to permit a reasonable inference of age discrimination. *Smith v. N3 Oceanic, Inc.*, No. 17-1041, 2017 WL 5632404, at *2 (3d Cir. Nov. 22, 2017) (citing *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004)). "Satisfying the *prima facie* elements creates an inference of unlawful discrimination," and "the *prima facie* case is not intended to be rigid, mechanized, or ritualistic." *Willis*, 808 F.3d at 644 (internal quotation marks and citations omitted).

"Under the burden-shifting framework, once the plaintiff makes out a prima facie case, the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the adverse action." *Smith*, 2017 WL 5632404, at *2 (quoting *McDonnell Douglas*, 411 U.S. at 802); *see also Muhammad v. Sills Cummis & Gross P.C.*, 621 F. App'x 96, 100 (3d Cir. 2015) ("If the plaintiff makes a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the employer to show that the action it took was not

---

[5]    *See also Gavurnik v. Home Props., L.P.*, No. 17-1256, 2017 WL 4812558, at *3 (3d Cir. Oct. 25, 2017) ("We apply the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to . . . ADEA claims for disparate treatment . . . where there is no direct evidence of discrimination.") (footnote omitted).

discriminatory.") (internal citations omitted).  "If the employer demonstrates a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to show that the employer's stated reason was pretextual."  *Smith*, 2017 WL 5632404, at *2 (citing *Willis*, 808 F.3d at 644-45).

> ### 2. Griffiths has not set forth a prima facie case of discrimination (i.e., the first part of the *McDonnell Douglas* burden-shifting framework) because there is no genuine issue of material fact about whether he suffered an adverse employment action

Griffiths argues that the Secretary "only seems to challenge whether Plaintiff can demonstrate an adverse employment action as it relates to a *prima facie* case (i.e., the third and fourth prongs)."  (Pl. Opp. Br. at 5 (citation omitted)).  He contends that, "[w]hile not laid out explicitly, [the Secretary] essentially concedes that [Griffiths] is in a protected class and was qualified for the position in question."  (*Id.*).  Griffiths avers that the inquiry therefore turns on whether Griffiths "suffered an adverse employment action when [the Secretary] failed to consider him for the temporary supervisor position and whether a reasonable inference of age discrimination can be drawn."  (*Id.*).

To that end, Griffiths asserts that the "failure to promote or consider [him] for the temporary supervisor position is clearly and unequivocally an adverse employment action" and "[i]t makes no difference whether there was an increase in pay."  (*Id.*).  He says that the inquiry into whether he suffered an adverse employment action "can be resolved rather quickly."  (*See id.*).

In response, as an initial matter, the Secretary argues that Griffiths "did not present a disparate treatment claim in his EEO complaint, and the agency did not accept one. Thus, the Court should find that no disparate treatment claim is properly before the Court."  (Def. Reply Br. at 4).  In any event, the Secretary disputes (among other things) that there was any "adverse

employment action" relating to the temporary 60-day position because Griffiths "cites no case where the court held that not allowing an employee to exercise supervisory duties without additional compensation for a 60-day period constitutes an adverse employment action" and, moreover, "there is no evidence that this brief opportunity was considered prestigious, that it substantially affected the volunteers' earning potential, or that it caused a significant change in their working conditions." (*See id.* at 6).

The Court assumes that the disparate-treatment claim is properly here and thus addresses what appears to be the crux of the dispute: is there a genuine issue of material fact about whether Griffiths suffered an adverse employment action?

"The ADEA defines an adverse employment action as discrimination with respect to the 'compensation, terms, conditions, or privileges of employment.'" *Swain v. City of Vineland*, 457 F. App'x 107, 110 (3d Cir. 2012) (quoting 29 U.S.C. § 623(a)(1)). "To qualify as an adverse employment action in the discrimination context, an action must create 'a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a significant change in benefits.'" *Oguejiofo v. Bank of Tokyo Mitsubishi UFJ Ltd*, 704 F. App'x 164, 168 (3d Cir. 2017) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (emphasis in original).[6] Indeed, an adverse employment action "is one that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Langley v. Merck & Co., Inc.*, 186 F. App'x 258, 260 (3d Cir. 2006) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)).

---

[6]     The Court recognizes that the *Oguejiofo* case involved Title VII and state discrimination claims, not ADEA claims. But that appears to be a distinction without a difference because the quoted language from the Supreme Court's *Burlington Industries* case—which the Circuit relies on in *Swain*, for example—is likewise used in the ADEA context. *See* 457 F. App'x at 100.

"Minor actions, such as lateral transfers and changes of title and reporting relationships, are generally insufficient to constitute adverse employment actions." *Langley*, 186 F. App'x at 260. *Id.* (footnote omitted). "While direct economic harm is probative, so, too, is conduct that substantially decreases one's earning potential or disrupts his working conditions." *Swain*, 457 F. App'x at 110.

"In cases where an employee seeks a transfer to a new position within the same organization, courts require that the employee demonstrate that the transfer sought would have resulted in a promotion, i.e., that the position was objectively better than his or her current position." *Woods v. Salisbury Behavioral Health, Inc.*, 3 F. Supp. 3d 238, 251 (M.D. Pa. Mar. 12, 2014) (citations omitted). "[T]he denial of a position for which an employee has a subjective preference without showing that the position is objectively better than his or her current position fails to establish the adverse employment action necessary for a prima facie case of discrimination." *Id.* at 252 (citation omitted).[7]

Here, to begin with, the temporary supervisor position involved no pay raise, advancement in salary grade, or additional benefits when acting in the 60-day periods. (*See* Secretary's SMF ¶ 70; *see also id.* ¶ 49 (Vazquez's December 5, 2012 email: "I would like to extend an opportunity to perform in the role of temporary supervisor on a rotating basis for 60 days. Keep in mind that there will **NOT** be any personnel action associated with this position and volunteering will simply serve as an opportunity to enhance your skill base by understanding the roles and responsibilities of serving in a supervisory capacity." (emphasis in original)); D.E. No. 45-6 at 22:19-23:10 ("**Q.** In 2012, in December, were you aware that if you were to volunteer

---

[7]     *See also Swain*, 457 F. App'x at 110 ("Even if the responsibilities of a K-9 sergeant are 'significantly different' than those of a street crimes sergeant, there is no indication that these different responsibilities are objectively better (e.g., more prestigious or less burdensome). In other words, this is not a case where the transfer that was denied would, in effect, have been a promotion. Indeed, Swain relies only upon his subjective preference for the K-9 position, which is insufficient to establish an adverse employment action.") (internal citation omitted).

that you wouldn't get a pay increase, even if you got the volunteer position? **A.** If you got the temporary position you're talking about? **Q.** Yes. **A.** If you took it, you would not get a promotion, a pay increase.")).

The Court's analysis does not stop there. Griffiths cites the following evidence to show the temporary position constituted a promotion: "additional responsibilities"; "valuable experience"; and the "supervisory role" being a "resume booster." (*See* Pl. Opp. Br. at 6).

It is undisputed that the temporary supervisor position—the rotating Acting Supervisory Supply Chain Security Specialist—had increased and heightened responsibilities compared with Griffiths's position—the Supply Chain Security Specialist. (*See, e.g.*, Secretary's RSMF ¶¶ 135, 160). Nowhere, however, does Griffiths say what the increased or heightened responsibilities were. And this is problematic because the Court can't assess whether a jury could reasonably find from the change in responsibilities that the temporary supervisor position was objectively better than Griffiths's position. *See Swain*, 457 F. App'x at 110 ("[T]here is no indication that these different responsibilities are objectively better (e.g., more prestigious or less burdensome).").

Further, it is true one of Griffiths's colleagues (also a Supply Chain Security Specialist during the relevant time period) agreed in a deposition that the temporary position would have provided "some valuable management experience." (*See* D.E. No. 45-6 at 23:8-10). Relatedly, Griffiths asserts "one would expect that the supervisory role would serve as a resume booster and Christine Azzolini testified to that effect during her deposition." (Pl. Opp. Br. at 6). Even though Griffiths cites the wrong portion of her testimony (*see id.*), the Court independently found that Azzolini testified as follows:

> 13     Q.     Did you think at the time when you had
> 14     applied for the temporary position that that would
> 15     help you get to a permanent position?
> 16     A.     When I applied for it, I figured it
> 17     would look good on a resume and no matter where I
> 18     went within customs it would be an asset.

(D.E. No. 45-5 at 21:13-18).

The problem is as follows. Griffiths is essentially inviting the Court to infer that, because there was valuable experience and resume-related utility, a jury could find that being a temporary supervisor was a promotion—i.e., that it was *objectively better* than Griffiths's position (even though there is no evidence about what the increased or heightened responsibilities were). But, even viewing the facts in the light most favorable to Griffiths and making all reasonable inferences in his favor, this the Court cannot do on this record.

In particular, there is no evidence that volunteering for the temporary supervisory position was considered prestigious or a stepping stone. *See Swain*, 457 F. App'x at 110 ("While Swain alleges that the K–9 unit is a 'specialized endeavor' with opportunities for career advancement and overtime, he does not contend that his salary, benefits, or prestige would have changed, or assert any specific denial of overtime.") (internal citation omitted); *Woods*, 3 F. Supp. 3d at 252 ("[T]he record is devoid of any evidence that [plaintiff's] benefits would have changed had she been selected as the school coordinator or that the school coordinator position was more prestigious. . . . [Plaintiff's] preference for the school coordinator position because it may have lead to a career in school administration does not demonstrate an adverse employment action. As noted by [defendant], [plaintiff] did not testify that she sought the position in order to embark on a career in school administration, and [plaintiff] further fails to cite any evidence in

the record to support her claim that the failure to be selected as school coordinator hindered her career prospects.").

After all, to qualify as an adverse employment action in the discrimination context, an action must create a *significant* change in employment status. *See Burlington Indus.*, 524 U.S. at 761. It must be "one that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Langley*, 186 F. App'x at 260 (quoting *Cardenas*, 269 F.3d at 263). The Court finds there is insufficient evidence from which a reasonable jury could so find here.[8]

In sum, the aforementioned discussion does not reflect weighing of evidence; it reflects determining that there is an absence of evidence from which a reasonable jury could find that a failure to make Griffiths a temporary supervisor constituted a failure to promote. Griffiths thus has failed to create a genuine issue of material fact about whether he suffered an adverse employment action. *See Langley*, 186 F. App'x at 260-61; *cf. Oguejiofo v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 14-4513, 2016 WL 5329588, at *7 (D.N.J. Sept. 20, 2016) ("[T]his was not an adverse employment action because it was a reassignment, not a demotion, and Plaintiff suffered no change in job title, pay or benefits as a result. The reassignment was a mere change in reporting relationship. Indeed, despite the assignment change, Plaintiff maintained his title as Vice President at the same rate of pay throughout his employment.") (internal citations omitted), *aff'd*, 704 F. App'x 164.

---

[8] The Court notes that, to the extent Griffiths argues that he couldn't apply for the temporary position (*see, e.g.*, Pl. Opp. Br. at 5), he points the Court to nothing in the record for any such assertion. Rather, as the Secretary aptly notes (*see* Def. Reply Br. at 5) it is undisputed that Vazquez presented the entire staff of Supply Chain Security Specialists in the Newark C-TPAT office with an opportunity to serve in the temporary position via email. (*See* Secretary's SMF ¶¶ 48-50). And, in fact, Griffiths communicated his interest in the temporary position about two months after Vazquez presented it to the staff—and Vazquez responded. (*See id.* ¶¶ 49, 50, 62, 63).

So this means that Griffiths has not made out a prima facie case for discrimination and the Court need not go any further regarding the burden-shifting framework. The Court grants summary judgment in favor of the Secretary on Griffiths's disparate-treatment claim. *See Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 171 (3d Cir. 2001) ("In sum, we hold that [the plaintiff] did not produce evidence from which a reasonable jury could find an adverse employment action, which is a prerequisite to a successful age discrimination claim. Therefore, we will affirm the District Court's summary judgment.").[9]

## B. Griffiths's hostile-work-environment claim must be dismissed.

### 1. The Law

For resolving the Secretary's motion, the Court assumes that a hostile-work-environment claim is cognizable under the federal-sector provision of the ADEA. *See Ullrich*, 457 F. App'x at 140 n.6 ("Assuming without deciding that hostile work environment claims are cognizable under the federal-sector provisions of Title VII and the ADEA, similar requirements apply.") (citations omitted); *see also Culler v. Sec'y of U.S. Veterans Affairs*, 507 F. App'x 246, 249-50 (3d Cir. 2012).

"In order to establish a hostile work environment claim under the ADEA, a plaintiff must establish that: (1) he suffered intentional discrimination because of age; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person in the same position; and (5) respondeat superior liability exists." *Vance v. VisionQuest Nat'l, Ltd.*, No. 09-0284, 2013 WL 3967945, at *17 (W.D. Pa. Aug. 1, 2013) (citations omitted). Further, "[t]o prevail on a hostile work environment

---

[9] The Secretary argues that Griffiths conflates the temporary supervisor position with an "entirely distinct opportunity that became available more than two years later." (*See* D.E. No. 42-1 ("Def. Mov. Br.") at 5). As evident from Griffiths's opposition brief, however, he doesn't meaningfully rely on this later opportunity in relation to the adverse-employment-action issue. And so the Court sees no reason to discuss the differences between the two opportunities.

claim, a plaintiff must show that his workplace was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *Culler*, 507 F. App'x at 249 (quoting *Nat'l. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)) (alteration in original).

Notably, "[t]he discrimination must be 'because of' the employee's protected status or activity." *Id.* (citing *Andreoli v. Gates*, 482 F.3d 641, 643 (3d Cir. 2007)).

**2.    Griffiths has failed to show evidence that any of the alleged incidents of harassment were causally related to age**

The Secretary argues that, even if the particular incidents that Griffiths relies on for his claim happened, Griffiths cannot show that the incidents were based on his age.  (*See* Def. Mov. Br. at 19).  In other words, the Secretary avers that Griffiths has failed to show that any of the allegations at issue "are causally related" to his age.  (*See id.* at 20).

Griffiths argues that, although "somewhat unclear" from the Secretary's motion, it seems the Secretary challenges whether the conduct at issue was severe and pervasive.  (Pl. Opp. Br. at 13).  Griffiths cites his colleagues' complaints about the "civil war replica weapon" that he brought to work before he expressed his interest in the temporary position.  (*Id.*).  He also cites the delayed Canada trip.  (*Id.*).  He cites the purported bribe and related complaint to the Office of Internal Affairs.  (*Id.*).  He states that the "Memorandum of Instruction" was "essentially a form of discipline."  (*Id.* at 13-14).  Finally, he cites a 2015 incident in which Vazquez made "angry facial expressions" and "harassed" Griffiths.  (*Id.* at 14).

But nowhere in his opposition brief does Griffiths address the issue raised by the Secretary's motion: whether any of the complained-of incidents were causally related to his age or any protected activity.  (*See* Pl. Opp. Br. at 12-14).  Indeed, he "has provided no evidence that

he was harassed *because of* his age." *See Bolen v. Potter*, No. 06-2730, 2008 WL 2446838, at *3 (D.N.J. June 13, 2008) (emphasis added). Tellingly, Griffiths leaves unrebutted the following contention by the Secretary: "when asked more directly whether he believes that there is a nexus between his alleged workplace harassment and his protected classes, the Plaintiff stated that he does not know if there is a connection." (Def. Mov. Br. at 21-22 (citing Griffiths's 7/29/14 deposition testimony at 80:25 to 81:13 that includes the following: "**Q.** Do you believe that Harvey Vazquez has discriminated against you based upon your age? **A.** I don't know.")).

To be sure, Griffiths recognizes the requirement at issue for his claim for hostile work environment: "he suffered intentional discrimination *because of* his status." (Pl. Opp. Br. at 12 (emphasis added)). The problem is he only addresses whether the underlying conduct was sufficiently severe or pervasive: "it seems that Defendant is challenging whether the conduct at issue in this case was 'severe and pervasive.'" (*See id.* at 13). This is puzzling because the Secretary states in the moving brief (among other things) that: (1) "Even assuming that the alleged incidents occurred, the Plaintiff cannot establish that the incidents were based on his age, race, gender or protected activity"; (2) "Plaintiff has failed to show that *any* of the allegations are causally related to any of his statutorily protected classes"; and (3) "Plaintiff fails to show a causal nexus between any of the alleged hostile-work-environment incidents and his protected classes." (Def. Mov. Br. at 19-23 (emphasis in original)).

Nowhere does Griffiths even attempt to explain how the incidents—any of them individually or collectively—are enough evidence from which a reasonably jury could find that the alleged harassment or discrimination was because of Griffiths's age. In fact, age isn't even referenced in any one of the cited incidents, and not one of the several statements of fact that Griffiths cites has anything at all to do with age. (*See* Pl. Opp. Br. at 12-14).

This is fatal to his claim—and the Court must grant summary judgment in favor of the Secretary on Griffiths's hostile-work-environment claim. *See, e.g.*, *Pierce v. Donahoe*, 963 F. Supp. 2d 366, 376-77 (D. Del. 2013) ("Plaintiff's claim concerning harassment on the basis of age, in effect, is a hostile work environment claim. . . . [P]laintiff does not provide any evidence that her coworkers and supervisor's remarks and actions concerned her age. Therefore, defendant's summary judgment motion is granted for this claim.") (internal citation omitted).[10]

### C. Griffiths's retaliation claim must be dismissed.

#### 1. The Law

Again, as an initial matter, the "federal-sector provisions of Title VII and the ADEA do not explicitly ban retaliation; however, the Supreme Court has held that § 633a(a) prohibits retaliation against a federal employee who complains of age discrimination." *Ullrich*, 457 F. App'x at 139 n.5 (citing *Gomez-Perez v. Potter*, 553 U.S. 474, 491 (2008)). Like the Third Circuit has stated, the Court will assume that "Title VII similarly bans retaliation in federal employment." *See id.* (citations omitted).

Both the ADEA and Title VII "make it unlawful for an employer to retaliate against an employee for either opposing any practice made unlawful by their respective provisions or for participating in any manner in an investigation, proceeding, or hearing under their respective provisions." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (internal quotations marks, alterations, and citations omitted). Again, under the applicable *McDonnell*

---

[10]     *See also Anderson v. Boeing Co.*, No. 15-3073, 2016 WL 9446648, at *24 (E.D. Pa. Aug. 30, 2016) ("Here, none of the putative acts were facially discriminatory, and [the plaintiff] has pointed to no record evidence that can support a finding that the neutral actions had any relation to her race, national origin, or to discrimination based on these protected characteristics."); *O'Malley v. Fairleigh Dickinson Univ.*, No. 10-6193, 2014 WL 67280, at *17 (D.N.J. Jan. 7, 2014) ("[The plaintiff's] claims fail under the 'because of' language—just as she has failed to adduce evidence illustrating that she was treated differently because of age, sex, or national origin, and just as she has not raised a genuine dispute with respect to whether she engaged in a protected activity under the ADEA or Title VII, she has failed to show that the hostile environment she allegedly experienced had anything to do with these protected characteristics or any protected activity.").

*Douglas* framework, a plaintiff asserting a retaliation claim first must establish a prima facie case by showing: (1) that he engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with the protected activity; and (3) a causal connection between the protected activity and the employer's adverse action. *Id.* at 193.

"If the plaintiff makes these showings, the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action." *Id.* (citation omitted). "If the employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (internal quotation marks and citations omitted).

    2.    **Griffiths has not set forth a prima facie case of retaliation (i.e., the first part of the *McDonnell Douglas* burden-shifting framework) because there is no genuine issue of material fact about whether there was an adverse action**

In moving for summary judgment, the Secretary argues (among other things) that "there is no genuine dispute that the Plaintiff does not allege a prohibited 'personnel action' in this case, the Plaintiff's retaliation claims fail as a matter of law." (Def. Mov. Br. at 29). In opposition, Griffiths "submits that adverse employment actions took place in the form of failing to promote him to the acting supervisor position." (Pl. Opp. Br. at 15). In response, the Secretary asserts that "CBP did not take any adverse personnel action against him." (Def. Reply Br. at 7). The Secretary contends that a "federal employee alleging a retaliation claim under either the ADEA or Title VII must demonstrate that he was subjected to an adverse personnel action" and, "[s]ince the Plaintiff does not challenge a prohibited 'personnel action' in this case, his retaliation claims fail as a matter of law." (*Id.*).

"A broader definition of adverse action, 'extend[ing] beyond workplace-related or employment-related retaliatory acts and harm,' applies to retaliation claims than to discrimination claims." *Swain*, 457 F. App'x at 111 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (alteration in original)). "In this context, acts of retaliation qualify as adverse employment actions if they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Remb v. Alcon Labs., Inc.*, 701 F. App'x 103, 107 (3d Cir. 2017) (quoting *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006), *as amended* (Sept. 13, 2006)). "Stated differently, a plaintiff may meet her burden by demonstrating that her employer's conduct is 'likely to deter victims of discrimination from complaining to the EEOC.'" *Hare v. Potter*, 220 F. App'x 120, 128 (3d Cir. 2007) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

The "analysis focuses not on isolated incidents, but rather on the 'overall scenario.'" *Swain*, 457 F. App'x at 111 (quoting *Cardenas*, 269 F.3d at 261). Finally, the inquiry is an objective one. *See Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 852 (3d Cir. 2016) (stating that "we use an objective standard, in which a reasonable employee would have found the alleged retaliatory actions materially adverse in that they well might have dissuaded a reasonable worker from making or supporting a charge of discrimination") (internal quotation marks and citations omitted).

As noted, the parties agree that the only purported adverse employment action is that Griffiths didn't get to serve as an acting supervisor. (*See* Pl. Opp. Br. at 15; Def. Reply Br. at 7). And in a case that Griffiths himself relies on (*see* Pl. Opp. Br. at 14), the Third Circuit stated in no uncertain terms that: "For an employer's action to satisfy the second prong of a prima facie case of retaliation, the plaintiff 'must show that a reasonable employee would have found the

challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Daniels*, 776 F.3d at 195 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

But Griffiths doesn't explain how the conduct at issue meets this standard. (*See* Pl. Opp. Br. at 15). More specifically, he doesn't argue—never mind point to evidence—how the circumstances surrounding his alleged failure-to-promote constitutes an overall scenario that might have dissuaded a reasonable worker from making or supporting a charge of discrimination. (*See id.*). So it is unsurprising that the Secretary's first point in reply is there was no adverse personnel action against him. (*See* Def. Reply Br. at 7).

To be sure, the Court is mindful that: (1) it must view all the facts and the reasonable inferences therefrom in the light most favorable to Griffiths; and (2) "context matters"—i.e., whether an action is materially adverse "often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69 (internal quotation marks and citation omitted); *Morrison v. Carpenter Tech. Corp.*, 193 F. App'x 148, 154 (3d Cir. 2006).

But here again, the Court finds that Griffiths has a lack-of-evidence problem that is fatal to his claim. *See Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citation omitted) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."). In opposing summary judgment, just calling the failure to give Griffiths the temporary supervisor position an "adverse employment action[]" does not make it so. (*See* Pl. Opp. Br. at 15). Indeed, Griffiths's

opposition to the Secretary's adverse-action contention amounts to one line with no citation to law or the record: "Plaintiff submits that adverse employment actions took place in the form of failing to promote him to the acting supervisor position as explained above [in his brief]." (*Id.*).

In particular, Griffiths doesn't argue or point to any evidence (*see id.* at 14-16) supporting that the temporary-supervisor position could have contributed significantly to his professional advancement—or that he would (or did) suffer an injury or harm as a result of not being a temporary supervisor. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69; *Morrison*, 193 F. App'x at 154.[11] After all, "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67. And it is worth reiterating: "The objective 'reasonable employee' standard is important because '[i]t avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.'" *Lawrence v. Schuylkill Med. Ctr. E.*, No. 11-1339, 2012 WL 3536978, at *19 (M.D. Pa. Aug. 14, 2012) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68-69) (alteration in original). The "inquiry is not concerned with Plaintiff's subjective perspective, but rather with that of the reasonable worker." *Id.* at *27.

The Court thus finds that Griffiths has failed to adduce and cite evidence from which a reasonable jury could find that a reasonable employee would be dissuaded from making a charge

---

[11]     *Cf. Hare*, 220 F. App'x at 128-29 ("Hare first claims the Post Office retaliated against her by not selecting her for the Career Management Program. She argues this is a materially adverse action because the program is designed to train and fast-track employees with leadership skills into management-level positions. . . . Applying the pre-*Burlington Northern* standard, the District Court found Hare's exclusion from the CMP did not rise to the level of an adverse employment action. In light of *Burlington Northern*, however, we find Hare's failure to be selected a 'materially adverse' action. An email to Hare's manager from a CMP coordinator describes the program as follows: 'The Managerial Skills program provides participants strategies for managing USPS operations and the workforce. During the course the participants engage in a variety of learning activities and develop a draft IDP.' In addition, [a manager] explained that the program helps participants 'enhance their skills,' and when asked whether the program is a stepping stone to advancement, he said, 'It's important.' Given how the program may 'contribute[ ] significantly to [an] employee's professional advancement,' we find not being selected for it is a 'materially adverse' action.") (internal citations omitted) (alterations in original).

of discrimination based on a failure to get the temporary supervisory position. The Court grants summary judgment in favor of the Secretary on Griffiths's retaliation claim.

### D. Griffiths withdraws certain claims.

In his opposition brief, Griffiths states: "With the Court's consent Plaintiff respectfully withdraws his claims for race and gender discrimination. However, Plaintiff still wishes to proceed with his ADEA and Title VII retaliation claims." (Pl. Opp. Br. at 2 n.1). The Secretary responds that, "[s]ince the Plaintiff received a full opportunity to conduct discovery on all of his claims, and since the Plaintiff received ample notice and opportunity to respond to Defendant's summary judgment motion, the Court should dismiss the Plaintiff's race and gender discrimination claims with prejudice." (Def. Reply Br. at 4 (internal citations omitted)). Plaintiff didn't request a sur-reply to address this issue and, as such, the Secretary's contention is left unrebutted. So Griffiths's Title VII race and gender discrimination claims are deemed withdrawn with prejudice by the Court.[12]

## V. Conclusion

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (internal quotation marks and citations omitted). "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to

---

[12]    *See, e.g.*, *Hadeed v. Advanced Vascular Res. of Johnstown, LLC*, No. 15-0022, 2017 WL 4998663, at *5 (W.D. Pa. Oct. 30, 2017) ("In their Response to Defendants' Motion for Judgment on the Pleadings and Motion for Summary Judgment, Plaintiffs expressly 'consent to the dismissal of Count 5 of the Complaint—Fraudulent Misrepresentation.' Therefore, the Court grants summary judgment in favor of Defendants as to Count 5 of the Complaint and dismisses Plaintiffs' fraudulent misrepresentation claim with prejudice.") (internal citation omitted); *Gyda v. Temple Univ.*, No. 98-1374, 2000 WL 675722, at *4 (E.D. Pa. May 23, 2000) ("[I]n Plaintiff's Response to Defendants' Motion for Summary Judgment plaintiff agreed to withdraw these causes of action. See Plaintiff's Memo., at 9-10. Accordingly, Counts 1-3 against defendant Temple University will be marked withdrawn with prejudice by the Court.") (internal citation omitted).

have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id.* The Court has construed Rule 56 this way and finds that Griffiths's three claims each lack particular factual bases.

The Court need thus not reach several arguments, such as those about: (1) pretext in the third part of the *McDonnell Douglas* burden-shifting framework for Griffiths's disparate-treatment ADEA claim (*see, e.g.*, Pl. Opp. Br. at 7-12); (2) each of the incidents Griffiths cites in support of his hostile-work-environment claim (*see, e.g.*, Def. Reply Br. at 12-14); and (3) a causal connection for purposes of Griffiths's retaliation claim (*see, e.g.*, Pl. Opp. Br. at 15-16). The Court's resolution of the parties' disputes about each of Griffiths's three claims makes addressing such arguments unnecessary.

An accompanying Order follows, which grants the Secretary's motion for summary judgment and dismisses this case.

*s/ Esther Salas*
**Esther Salas, U.S.D.J.**
